**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 28 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

JOSE GALLEGOS,

      Plaintiff-Appellant,

and

JULIE GALLEGOS,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, a
municipal corporation, and JOHN DOE, an
unidentified hit-and-run driver,

      Defendants,

and

MAGDALENA SANTOS and DANIEL
LOFGREN,

      Defendants-Appellees.

No. 96-1298
(D.C. No. 95-WY-1559-AJ)
(D. Colo.)

---

Craig Cornish (Donna Dell'Olio on the briefs) of Cornish & Dell'Olio, Colorado
Springs, Colorado, for Plaintiff-Appellant.

Stephen K. Hook, Assistant City Attorney (James G. Colvin II, City Attorney,
with him on the brief), Colorado Springs, Colorado, for Defendants-Appellees.

---

Before **ANDERSON**, **TACHA** and **BRORBY**, Circuit Judges.

**BRORBY**, Circuit Judge.

Appellant Jose Gallegos filed this civil rights action in federal court against the city of Colorado Springs and Colorado Springs police officers Magdalena Santos and Daniel Lofgren. Mr. Gallegos alleged Officer Santos and Sergeant Lofgren deprived him of his rights under the Fourth and Fourteenth Amendments by seizing his person. The United States District Court for the District of Colorado entered judgment for the defendants, concluding the Colorado Springs police officers did not unreasonably seize Mr. Gallegos. Mr. Gallegos appeals the district court's judgment and we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:08 a.m. on May 20, 1992, Officer Santos and Sergeant Lofgren received a dispatch in their police cruiser concerning a reported prowler in the area of the intersection of William Avenue and East Cheyenne Road. The dispatcher informed the officers a resident had heard noises outside, had seen two people running south on William Avenue, and had "[h]eard a noise like they were messing with the fence." While in route to the area of the alleged disturbance,

-2-

Sergeant Lofgren and Officer Santos received a second dispatch concerning a report received from another resident of the area. The second dispatch indicated a man and woman were "yelling and arguing" on William Avenue, the man was wearing a white T-shirt, and the man appeared to be drunk.

The officers arrived at William Avenue at approximately 1:15 a.m. Upon their arrival, they observed Mr. Gallegos walking north on the east sidewalk of William Avenue. Sergeant Lofgren and Officer Santos parked their police cruiser and walked toward Mr. Gallegos. As they approached Mr. Gallegos, the officers noticed he was wearing a gray tank top and smelled of alcohol. Mr. Gallegos appeared distraught as he was crying and "talking really loudly or shouting." Both of his hands were over his face and he appeared unsteady on his feet.

Sergeant Lofgren approached Mr. Gallegos in an effort to determine what was going on and to ascertain whether Mr. Gallegos had been near the fence that had been mentioned in the first dispatch report. However, when Sergeant Lofgren asked Mr. Gallegos what was going on, Mr. Gallegos ignored the sergeant's question. Sergeant Lofgren then grasped Mr. Gallegos' left arm and Mr. Gallegos jerked away and proceeded to walk on the sidewalk. Sergeant Lofgren then grabbed Mr. Gallegos' arm for a second time. In response, Mr. Gallegos jerked

away and exclaimed "[l]eave me the fuck alone."

At that point, Sergeant Lofgren determined, based upon the totality of the circumstances, including Mr. Gallegos' refusal to stop, probable cause existed to arrest Mr. Gallegos for interference with a police officer, in violation of the ordinances of Colorado Springs. Sergeant Lofgren thus called for backup assistance, using his portable police radio.

At or around the time Sergeant Lofgren was calling for backup assistance, Mr. Gallegos walked into East Cheyenne Road shouting unrecognizable words. The officers followed Mr. Gallegos into the road and Sergeant Lofgren grabbed Mr. Gallegos' shoulder. Mr. Gallegos then jerked away and pivoted and faced the officers. With his fists clenched at waist level, Mr. Gallegos positioned himself in a crouched stance, similar to a wrestler's position.

Officer Lofgren reacted to Mr. Gallegos' crouched position by taking a step back from Mr. Gallegos. However, Officer Santos, fearing for her safety, stepped toward Mr. Gallegos and applied an arm bar maneuver to Mr. Gallegos' right

-4-

arm.[1] Upon observing this procedure, Sergeant Lofgren grasped Mr. Gallegos' left arm and initiated a take-down action to ensure Mr. Gallegos would not strike Officer Santos with his free arm. After some resistance by Mr. Gallegos, the officers placed Mr. Gallegos face down on the pavement. As Sergeant Lofgren reached for his handcuffs, he heard motor vehicles approaching from about a block away. One vehicle swerved past the parties, and a split second later, a second vehicle skidded sideways into Officer Santos and came to a stop on top of Mr. Gallegos.

The vehicle knocked Officer Santos back approximately ten feet. After Officer Santos regained her balance, she approached the vehicle and pounded on the passenger window with her flashlight. The vehicle then backed over Mr. Gallegos and drove away. From the time Sergeant Lofgren and Officer Santos arrived at William Avenue to the time the vehicle ran over Mr. Gallegos, only one minute and forty-four seconds elapsed.

Mr. Gallegos sustained serious injuries as a result of being run over by the unidentified vehicle on May 20, 1992. Mr. Gallegos filed suit in federal court

---

[1] The arm bar maneuver consisted of Officer Santos grabbing Mr. Gallegos' right wrist with her right hand while placing her left hand close to Mr. Gallegos' shoulder.

against Sergeant Lofgren, Officer Santos, the City of Colorado Springs, and John Doe, a hit-and-run driver, seeking to recover compensatory and punitive damages. Mr. Gallegos' amended complaint alleged, *inter alia*, Sergeant Lofgren and Officer Santos deprived Mr. Gallegos of his Fourth and Fourteenth Amendment rights by stopping him without reasonable suspicion and by unlawfully seizing him without probable cause.

On a motion for summary judgment, the district court determined the stop of Mr. Gallegos by Sergeant Lofgren and Officer Santos was supported by reasonable suspicion.[2] However, the court determined there was a genuine issue of material fact concerning whether Mr. Gallegos was seized without probable cause and whether Sergeant Lofgren and Officer Santos were entitled to qualified immunity for their actions.

Following a bench trial on the issue of liability, the court determined Mr. Gallegos' Fourth and Fourteenth Amendment rights were not violated because the seizure of Mr. Gallegos was justified by a "reasonabl[e] perceived threat to officer safety." Furthermore, to the extent Mr. Gallegos was subjected to an

---

[2] Mr. Gallegos conceded his municipal liability claim against the City of Colorado Springs should be dismissed. Accordingly, the district court dismissed this claim in its summary judgment order.

arrest, the court concluded Sergeant Lofgren and Officer Santos were entitled to qualified immunity. Following entry of judgment in favor of the defendants, Mr. Gallegos filed his Notice of Appeal.

## II. ISSUES RAISED ON APPEAL

Mr. Gallegos raises three issues on appeal: (1) whether Sergeant Lofgren and Officer Santos violated Mr. Gallegos' Fourth and Fourteenth Amendment rights by seizing him without reasonable suspicion; (2) whether the seizure of Mr. Gallegos escalated into an arrest that was not supported by probable cause, thus violating Mr. Gallegos' Fourth and Fourteenth Amendment rights; and (3) if the officers seized Mr. Gallegos in violation of his Fourth and Fourteenth Amendment rights, whether they were entitled to qualified immunity.

## III. ANALYSIS

### A. Was the Initial Stop of Mr. Gallegos Reasonable Under the Fourth Amendment?

The trial court determined the initial stop of Mr. Gallegos by Sergeant Lofgren and Officer Santos was reasonable under the Fourth Amendment because it was supported by reasonable suspicion. Mr. Gallegos contests this determination on appeal. Mr. Gallegos contends the record establishes his Fourth Amendment rights were violated because Sergeant Lofgren and Officer Santos did

not have a reasonable suspicion that Mr. Gallegos was involved in criminal activity. In determining whether the officers' actions were reasonable under the Fourth Amendment, we employ a *de novo* review. *United States v. King*, 990 F.2d 1552, 1556 (10th Cir. 1993). However, we must accept the district court's findings of fact unless they are clearly erroneous. *See Ornelas v. United States*, 116 S. Ct. 1657, 1663 (1996).

The Fourth Amendment protects "[t]he right of the people to be secure ... against unreasonable searches and seizures."[3] U.S. Const. amend. IV. The purpose of this amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967). "Of course, not all police-citizen encounters implicate the Fourth Amendment." *King*, 990 F.2d at 1556. Mere police questioning does not amount to a seizure and "'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place.'" *Id.* at 1556 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Generally, a person is not "seized" for purposes of the Fourth Amendment unless, "considering all the surrounding circumstances, the police

---

[3] The Fourth Amendment is applicable to the states through the Fourteenth Amendment. *Payton v. New York*, 445 U.S. 573, 576 (1980).

conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *King*, 990 F.2d at 1556 (quoting *Bostick*, 501 U.S. at 439).

Where a police-citizen encounter rises to the level of a seizure within the meaning of the Fourth Amendment, such seizure must be reasonable to be valid. *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (Fourth Amendment prohibits unreasonable seizures). Formal arrests or seizures that resemble formal arrests must be supported by probable cause to be reasonable. *United States v. Perdue*, 8 F.3d 1455, 1461 (10th Cir. 1993). However, mere investigatory detentions of persons may require less than probable cause to be reasonable. In *United States v. Terry*, 392 U.S. 1, 21 (1968), the Supreme Court held police officers can temporarily detain an individual suspected of criminal activity if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* stops "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Michigan v. Summers*, 452 U.S. 692, 699 (1981).

We must conduct a two-step inquiry to determine whether an investigative detention is reasonable under the Fourth Amendment. *King*, 990 F.2d at 1557. First, we must ascertain whether the detention was "'justified at its inception.'" *Id.* (quoting *Terry*, 392 U.S. at 20.) For a detention to be valid, the officer must have an articulable suspicion that a detainee has committed or is about to commit a crime. *Florida v. Royer*, 460 U.S. 491, 498 (1983). Neither "inarticulate hunches" nor "unparticularized suspicion" will suffice to justify an investigatory detention. *See Terry*, 392 U.S. at 22, 27. However, in determining the reasonableness of an investigative detention, "'common sense and ordinary human experience must govern over rigid criteria.'" *United States v. Walraven*, 892 F.2d 972, 975 (10th Cir. 1989) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). The Fourth Amendment "'does not require police officers to close their eyes to suspicious circumstances.'" *Id.* at 976 (quoting *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir. 1986)).

The second step in determining the reasonableness of an investigative detention consists of determining whether the officers' actions are "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *King*, 990 F.2d at 1557 (quoting *Terry*, 392 U.S. at 20).

In *Perdue*, we stated:

> *Terry* stops must be limited in scope to the justification for the stop. Officers may ask the detained individual questions during the *Terry* stop in order to dispel or confirm their suspicions, "[b]ut the detainee is not obliged to respond." Since police officers should not be required to take unnecessary risks in performing their duties, they are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop." An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent.

8 F.3d at 1462 (citations omitted). With these legal principles in mind, we now turn to the facts of the present case.

After thoroughly reviewing the record, we conclude, as did the trial court, the initial stop of Mr. Gallegos was a *Terry* investigative detention thus implicating the Fourth Amendment. To determine if this detention was reasonable, we must apply the aforementioned two-part test. First, we must decide whether, at the time of the stop, Sergeant Lofgren and Officer Santos had an articulable suspicion that Mr. Gallegos had committed or was about to commit a crime. The record reveals Sergeant Lofgren and Officer Santos were sent to William Avenue on May 20, 1992 after receiving two dispatches of suspicious activity occurring in the neighborhood. The first dispatch was a "prowler" report from a resident who had seen two people running on William Avenue and heard a noise like someone was "messing with the fence." The second dispatch was a

report from another resident who observed a man in a white T-shirt, who appeared to be drunk, arguing with a woman.

When the officers arrived at William Avenue at 1:15 in the morning, less than seven minutes after receiving the first dispatch, they observed Mr. Gallegos on the sidewalk acting in a very unusual fashion. Mr. Gallegos, who was wearing a gray tank top, was crying and talking loudly to himself. He had both of his hands over his face and he smelled of alcohol. When Sergeant Lofgren inquired as to what was going on, Mr. Gallegos did not respond. He appeared distraught.

Based on the totality of the circumstances, including the time of night, Mr. Gallegos' conduct, the odor of alcohol, and the two dispatch reports, we conclude the officers possessed a reasonable suspicion that Mr. Gallegos was involved in criminal activity. Thus, the officers acted reasonably in attempting to detain Mr. Gallegos. This was not a case of police officers arbitrarily stopping an individual walking down the sidewalk during the middle of the afternoon. Rather, Sergeant Lofgren and Officer Santos were aware of articulable and specific facts that justified their attempts to detain Mr. Gallegos. We believe the officers would have been derelict in their duties if they had simply ignored Mr. Gallegos and

allowed him to proceed.  Accordingly, we conclude the attempted detention of

Mr. Gallegos was justified at its inception.[4]

Next, we must determine whether the *Terry* stop was limited in scope to the

justification for the stop.  In reviewing the reasonableness of the scope of the

stop, we focus here on the actions of Sergeant Lofgren and Officer Santos

occurring prior to the arm bar maneuver applied by Officer Santos.  In section

III.B., *infra*, in the context of determining whether Mr. Gallegos was arrested, we

---

[4]  We also believe the initial stop of Mr. Gallegos was justified as a valid noninvestigatory stop.  In *King*, we stated:

> police officers are ... expected ... to exercise what the Supreme Court has termed "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity....  The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable per se as *Terry* only requires "specific and articulable facts which ... reasonably warrant [an] intrusion" into the individual's liberty.

990 F.2d at 1560 (citations omitted).

In the case at bar, Sergeant Lofgren and Officer Santos observed a distraught Mr. Gallegos on a public sidewalk in the middle of the night.  Not only did he smell of alcohol, but he was crying and walking down the street with his hands over his face.  In light of these facts, we believe the officers were justified in stopping Mr. Gallegos to check on his welfare.  Thus, the initial stop of Mr. Gallegos was valid under both an investigatory and noninvestigatory rationale.

will review the reasonableness under the Fourth Amendment of the arm bar maneuver and all actions occurring subsequent thereto.

Sergeant Lofgren and Officer Santos sought to detain Mr. Gallegos to determine whether he was the prowler a resident had reported to be messing with a fence and/or the man another resident had reported as being drunk and yelling at a woman. To make this determination, Sergeant Lofgren initially asked Mr. Gallegos what was going on. When Mr. Gallegos did not respond to Sergeant Lofgren's question, Sergeant Lofgren grabbed Mr. Gallegos' left arm. Mr. Gallegos jerked away and continued walking down the sidewalk. Thereafter, Sergeant Lofgren grabbed Mr. Gallegos' arm on two more occasions in an effort to detain him. However, each time, Mr. Gallegos jerked away from the officer's grasp.

We believe Sergeant Lofgren's actions were reasonably related in scope to the circumstances justifying the stop. Sergeant Lofgren grabbed Mr. Gallegos' arm in an effort to briefly detain Mr. Gallegos and confirm or dispel his suspicions. Although Sergeant Lofgren grabbed Mr. Gallegos' arm three separate times, his actions consisted of a relatively minor application of force that did not exceed the amount allowable under the circumstances. If anything, Sergeant

Lofgren did not exercise enough force to accomplish the purpose of the detention. Each time he grabbed Mr. Gallegos' arm, Mr. Gallegos broke free. Moreover, we do not believe the detention of Mr. Gallegos was a significant restraint on his liberty. From the time the officers arrived at William Avenue to the time Mr. Gallegos' assumed the crouched wrestling position, less than two minutes elapsed. Thus, we conclude the stop of Mr. Gallegos was a valid *Terry* stop that did not exceed the scope of its justification.[5]

**B. Did the Seizure of Mr. Gallegos Escalate into an Arrest that Was Not Supported by Probable Cause?**

Mr. Gallegos contends the officers' actions in taking Mr. Gallegos down in the street constituted an arrest. According to Mr. Gallegos, the officers lacked

---

[5] Mr. Gallegos also contends the trial court did not apply the correct legal standard for determining the reasonableness of a seizure under the Fourth Amendment. Mr. Gallegos appears to argue the trial court improperly determined the stop was reasonable because the officers were merely suspicious of Mr. Gallegos' behavior. Having conducted a *de novo* review of this contention, *see King*, 990 F.2d at 1556, we believe a fair reading of the trial court's summary judgment order indicates the trial court employed the correct legal standard and properly determined the stop of Mr. Gallegos was supported by a reasonable suspicion that "criminal activity was afoot." *See Terry*, 392 U.S. at 30. In any event, our determination that the stop of Mr. Gallegos was supported by a reasonable suspicion that Mr. Gallegos was engaged in criminal activity renders irrelevant Mr. Gallegos' challenge to the legal standard employed by the trial court.

probable cause to arrest him and, therefore, they violated his Fourth Amendment right to be free from unreasonable seizures.

It is well settled that a police-citizen encounter which goes beyond the limits of a *Terry* stop is an arrest that must be supported by probable cause or consent to be valid. *Perdue*, 8 F.3d at 1462. However, a *Terry* stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect or place him on the ground. *Id.* at 1463. Police officers are "'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.'" *Id.* at 1462 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). At least nine courts of appeals, including this circuit, have determined the use of "intrusive precautionary measures" (such as handcuffs or placing a suspect on the ground) during a *Terry* stop do not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment. *Id.* at 1463 (setting forth list of circuit authority). The hallmark of the Fourth Amendment is reasonableness. As long as the precautionary measures employed by officers during a *Terry* stop are reasonable, they will be permitted without a showing of probable cause. *See id.* In determining whether the precautionary measures were reasonable, the standard is objective -- "'would the facts available to the officer at the moment of the seizure

... "warrant a man of reasonable caution in the belief" that the action taken was appropriate.'" *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) (quoting *Terry*, 392 U.S. at 21-22).

In the present case, we must determine whether the *Terry* stop escalated into an arrest following the application of the arm bar maneuver by Officer Santos.  The district court concluded the take-down of Mr. Gallegos was  justified by a "reasonably perceived threat to officer safety."  The court did not find Mr. Gallegos was subjected to an arrest under the Fourth Amendment.  We agree.

The record reveals that following Sergeant Lofgren's third attempt to grab Mr. Gallegos' arm, Mr. Gallegos' demeanor and body position changed drastically. Previously, Mr. Gallegos had been intent on walking down the sidewalk with his hands covering his face.  In a matter of seconds, however, Mr. Gallegos removed his hands from his face, pivoted toward the officers, and crouched into a wrestler's position.  Mr. Gallegos was yelling and he appeared very angry.  He smelled as if he had been drinking.

Based on these objective facts, we believe Officer Santos reasonably believed her safety was in danger.  To gain control of the situation before her or

her partner was harmed, she made a split second decision to apply an arm bar maneuver to Mr. Gallegos. We cannot say this decision was unreasonable under the Fourth Amendment. Nor can we say Officer Lofgren's decision to initiate a take-down was unreasonable. Having witnessed Mr. Gallegos' strange and aggressive conduct, he now observed his partner, a police officer in field training, trying to gain control of a man who weighed 200 pounds or more. We believe Sergeant Lofgren harbored an objectively reasonable belief there was a serious risk Mr. Gallegos would strike Officer Santos with his free arm. Based on this belief, Sergeant Lofgren used a reasonable amount of force to bring Mr. Gallegos face-down on the pavement.

Only seconds after Sergeant Lofgren initiated the take-down procedure, Mr. Gallegos and Officer Santos unfortunately were struck by the hit-and-run driver. Nevertheless, we find, as did the trial court, that at the time Mr. Gallegos was injured, the actions taken by Sergeant Lofgren and Officer Santos were merely those "reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop."[6] *See Perdue*, 8 F.3d at 1462

---

[6] Although the middle of the street was not the most prudent location to bring the defendant to the ground, we do not believe the location renders the action unreasonable. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving." *Graham v.*

-18-

(quoting *Hensley*, 469 U.S. at 235.)  Thus, we conclude no arrest had taken place at the time Mr. Gallegos was hit by the car.[7]  Because Mr. Gallegos was not arrested, the officers did not need probable cause to justify their actions.[8]

---

*Connor*, 490 U.S. 386, 396-97 (1989).  Here, Mr. Gallegos entered the center of the road on his own volition.  While in the road, he clinched his fists and faced the officers in a crouched position.  In light of his increasing aggressiveness, the officers made an instant decision to gain control over him before the situation could escalate.  In light of the totality of the circumstances, we find the officers' decision to be reasonable.  It would make no sense for this court to require the police to wait for a suspect to leave the street before exercising force against the suspect.  Such a rule would place the welfare of peace officers at an even higher risk of danger than they are already subject to on a daily basis.

[7]  We note the fact Sergeant Lofgren intended to arrest Mr. Gallegos after he was taken down on the pavement did not turn the *Terry* stop into an arrest. Although an officer's subjective intent is a factor that may be considered in determining whether a stop has escalated into an arrest, *see United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988); *United States v. Morin*, 665 F.2d 765, 769 (5th Cir. 1982); *United States v. White*, 648 F.2d 29, 34 (D.C. Cir.), *cert. denied*, 454 U.S. 924 (1981), subjective intent is not determinative.  *Serna-Barreto*, 842 F.2d at 968.  In fact, some circuits appear to give little or no weight to an officer's subjective intent.  *See United States v. Jackson*, 652 F.2d 244, 250 (2d Cir.), *cert. denied*, 454 U.S. 1057 (1981) (objective factors rather than subjective factors govern propriety of stops and arrests; officer's subjective belief that his partner had placed suspect under arrest insufficient to convert *Terry* stop into arrest); *United States v. Beck*, 598 F.2d 497, 500 (9th Cir. 1979) (whether arrest has occurred depends on evaluation of all surrounding circumstances, not the subjective intent of officers involved).  Here, based on the totality of the circumstances, we conclude the detention of Mr. Gallegos was a valid *Terry* stop that did not escalate into an arrest.

[8]  Because we find the arm bar maneuver and subsequent take-down of Mr. Gallegos was based on a reasonable perceived threat to the officer's safety, we conclude these procedures satisfy the second prong of the *Terry* inquiry, *see supra*, p.19, and were reasonable under the Fourth Amendment.

**C.  Are Sergeant Lofgren and Officer Santos Entitled to Qualified Immunity for their Actions?**

Because we have determined Mr. Gallegos was not deprived of his rights under the Fourth and Fourteenth Amendments, we need not address the issue of qualified immunity.

## IV.  CONCLUSION

Based on the foregoing reasons, we hereby **AFFIRM** the decision of the district court.